Argument not to exceed 15 minutes per side. Mr. Amberg, you may proceed for the appellant. Thank you very much. Good afternoon. Good afternoon, your honors. It's great to see you. Jim Amberg, CGA appointed counsel for Mr. Rogers. You may please the court. I'm requesting five minutes of rebuttal time. I guess the one nice thing about the CGA is that I am also the trial counsel. I have done many, many trials over the years, all sorts of federal trials. Some of the most complex cases you've ever seen. I've done endless amounts of state criminal trials. This year, I think I've logged in about maybe about four or five months of trial days so far, just in federal trials. In all that time, I have never encountered such an egregious in-trial constitutional violation as what I saw in Mr. Rogers' case. As you can see, it was the forefront of our brief. I would say that this identification... The first question is why didn't you bring it up to the judge immediately when it happened? I completely understand that. Judge Mathis, this is what I would say. It took a little bit of time to even determine what happened there. This was so unusual and so shocking. I don't know how else to describe it. I would put any other trial lawyer in my position. Keep in mind, I am cross-examining Ms. Jones right after this happens. This is now becoming like an investigation in front of jurors about what happened. I'm learning more and more and more about this. This was not a situation where I had any idea that this was going to happen. The more I heard, the worse it got. I think we had one more witness. That allowed me to think about it a little bit. These allegations are serious. You want to make a serious objection. Isn't it problematic that you waited? Again, I think you raised it at the end of the day. Isn't it problematic that you waited to request a mistrial and raise that issue? I don't believe so in this case. I know that the government has cited some other cases that would suggest that. But when you look at those cases, and I compare this to trials that I've done, where you anticipate issues, you file motions, you file briefs, you get orders, and you're ready and prepared for issues to come up. This was so out of left field. Keep in mind, I'm finding out during a cross-examination that the government, in seeing a witness, a critical witness to their case, rather than immediately get them out of the courtroom when the defendant is sitting in there, they instead point out the defendant to the victim and explain that that's who he is. He's sitting there in handcuffs and things like that. You took a few steps forward. I mean, after you raised the issue, the judge struck that particular testimony. Sure. And rightfully so, although the real issue in this case is that it's our argument that the court should have granted a mistrial. And I don't say that lightly either. I think I even said that when I was in front of Judge Friedman arguing that, is that this was a mistrial-type situation. I can't think of any other circumstance I've been involved in. And to just briefly go back to our previous discussion, Judge Mathis, I'm finding out even more information when I get the responsive brief that night or maybe in the next morning from the government about the nature of what happened, where it gets even worse. And so in normal circumstances, yes, the objection would have been done immediately. It would have been done by me because I would have been prepared for that. This was so unusual. I put it in front of any trial lawyer. Any good trial lawyer would have done what I did. You have to know what's going on. Was there a break in the trial before the end of the day that you could have made the motion? From what I remember, we went opening statements, lunch, Ms. Jones. The issue happens right at the end of her direct, then cross, then I think there was one more witness, and then I made the objection. Well, that sounds timely to me. I mean, I wouldn't expect you to make your objection in front of the jury. You'd have to do it outside the presence of the jury. I think all you could do is you could ask the judge perhaps to excuse the jury to make a motion, but that's highly kind of irregular as well. Okay, you say you found out a lot more. I mean, the identification obviously is improper. Can you identify the perpetrator? Can you identify him? He's sitting there as the defendant and everything else. Is there evidence of bad faith? I mean, it looks to me like it's total incompetence by the U.S. Attorney to ask an identification question that he expects to have an answer no, but why even go there? He's not relying on identification. He's relying on the circumstantial evidence is what he's doing, so he shouldn't ask an identification question at all because you have a possibility of something like this happening. But one of the factors to determine whether we should grant a mistrial is bad faith. Do you have evidence that the U.S. Attorney acted in bad faith as opposed to just total incompetence? Well, to respond to that, I would say it like this. If it wasn't intentionally done... Well, he intentionally asked the question, but did he do it wanting that reaction? I mean, everybody else said that they were shocked by the answer, which to me indicates that he didn't plan it, that it wasn't premeditated, it was the opposite, that he just made a mistake. Sure, sure. I don't think it was a mistake. Okay, so you think it was in bad faith? I think, but bad faith in the sense of an egregious deprivation.  And because... You got me there. I agree it was. And... But, okay, but that's... No, I understand what you're saying, Judge, and I want to say it like this because here's how I feel about what happened there. I mean, the five factors we consider is whether the remark was unsolicited. Here it was solicited. Two, whether the government's line of questioning was reasonable. Obviously, it was not reasonable. Anyway, then we also consider whether it was done in bad faith. And I would make the argument that this wasn't like the government secretly had this plan to do this. I don't think that happens. I don't think anybody... If they did, I think I would probably grant your motion. Well, I would say this, though, is that look at the actions of what's happening leading up to that. The government literally hears my opening statement where the main crux of the entire defense is nobody identifies Mr. Rogers. In a case that is a classic circumstantial evidence case, nobody identifies him, ladies and gentlemen. I even put it on the PowerPoint and showed a picture. I put it in my brief. Wasn't there something to suggest that the government expected her to say, no, I don't know who that person is? Well, Judge, I don't know what the government was thinking even asking that question, but they indicate that they are having some conversation with this witness saying they're going to ask or somebody's going to ask about identification right when they are literally pointing at my clients, like that's the guy, before this witness is coming up there to testify. I just... It's such an unusual circumstance. It's such an unusual situation. I don't know. The entire trial at that point was done. I mean, there was no... It was just like a cloud over the rest of that trial. When this happens, I mean, just for some anecdotal evidence, when that happened and that witness does that, Mr. Rogers is weeping. He's weeping because of what's happened. I mean, my credibility was shot. It was just as unfair a trial as I have ever been in, and it wasn't our fault. And there were so many times the government could have stopped that. Like I said, you walk in and you see a witness sitting there. You don't show them who the defendant is and then tell them you're going to ask them an identification question. Get them out of there. You don't sit there two weeks before trial and say, oh, yeah, the guy that did this is going to be there. You don't let that person see this guy in handcuffs and then do this. It's a shame. This was not fair. I'm telling you. Your Honors, you take away all the legal stuff and we just... You ask, well, what are we doing here? To give somebody a fair trial, it was not a fair trial. We have to deal with the legal stuff. I understand. I understand that. We've got to see if it makes a difference, too. That's the other thing, is not every error is subject to reversal. So the other factors are whether the limiting instruction was immediate, clear, and forceful, whether there was any bad faith evidenced by the government, and whether the remark played a small part of the evidence against the defendant. The other factors here, I think, go against you, particularly all the circumstantial evidence. I mean, there is a lot of evidence. And I know it's circumstantial, but, you know, you have the palm print on one of the cars. You have DNA on another car. You have the cousin witnessing your client driving one of the stolen cars. You have the cousin's statement that your client came to her and showed the video and said, does this look like me? I mean, you've got a lot of evidence here. So to me, I have to determine whether it would make any difference. This identification was improper, and the jury is told to disregard it. But in view of all this other evidence, did it make a difference here? Oh, it made a difference here. Tell me why.  First, I understand when you look at this in the context of, well, look at all these different kinds of circumstantial evidence. I have been in many trials where I've seen all sorts of circumstantial evidence, and the jury acquits my client. It happened like two months ago in front of Judge Michelson in the case that I had. So there's a difference between circumstantial evidence and somebody getting up there and saying, that's the guy that did it. I mean, it is at a different level of proof. Was an admonition requested and given? Well, I requested a mistrial. The court at, I don't want to say the court was wavering, but did tell the government it was no slam dunk on their position to keep the trial going. And then the court does this curative instruction telling the jury to disregard this. And then that was actually confusing because the jury ends up telling the court clerk to, they had a question I think mid-trial where they wanted some more discussion about what that meant. You didn't ask for it. Did I ask for it? No, no, I asked for a mistrial. I thought that was the only problem. And even afterwards, Judge, I did that in the Rule 33 motion too. I'm very sure because I felt at that point that that trial, it was like throwing that skunk in the jury box. It was done the second that happened. I mean, the fact that I was up there asking questions to a witness to determine how the government had this just totally outlandish contact with this witness while we're doing the trial, I mean, that should raise a million red flags. It certainly did with me. I felt it was not a fair trial. Let's get back to the circumstantial evidence. And also I failed to mention the cell phones. The cell phone location had your client at the scene of all these carjackings. I mean, tell me why a reasonable juror would have discounted all these things. I know you claim the cousin is not credible. The cousin is the one that saw him driving one of the stolen vehicles and also said that he showed the video to her. Is that me? But how about the DNA? How about the palm print? How about the cell phone records? How is that not overwhelming evidence here? Well, I understand it's evidence. I don't think it's overwhelming evidence. I certainly argue that to the jury. How did you try to argue against it? Palm print evidence, for example. That's on the exterior of the Dodge Challenger, the orange one. That's as simple as, hey, where did you get the car? Bam, you put your hand right on it. Oh, he just happened to touch one of the stolen cars? Well, the palm print is on the exterior of the. . . What's he doing there? Well, look, I'll tell you. I mean, this is sort of a case where at least it's separate in two nights. One night is the white Ford Focus, but the rest of the cars are all on the second night. And it looks like a spree where different cars are getting carjacked with the previous cars. And, look, I argue that there was no proof. Is there an innocent explanation why his palm print is on one of the stolen cars? Well, I said he could have touched the car just on the exterior. If somebody pulls up and stole it. . . Why would he be near the car? Well, I could see a scenario, and I have to go back and read what I said to the jury, but I could see a scenario where somebody with all their friends standing around there pulls up this really cool orange Challenger and people are touching it. And that's why you saw all kinds of DNA on all these cars. My client's DNA was on a couple of the cars, but not on all of them. I did cross-examine the DNA expert from the government who indicated that you can have transference DNA. That is something that's very common. At first glance, yes, it seems like there's a lot of circumstantial evidence, but I was able to show and counter all of that evidence, even the phones. You have to show that, okay, a phone was going from place to place, but was my client in possession of that phone at the time? I did a huge trial a couple of years ago where there was allegations that all kinds of people were trading the phones around. Was that a defense here that his phone was being traded around? Well, I certainly made that argument. Did you have people that supported that? What I did was I had that, from what I remember, it was a while ago, but the agent was up there and I was asking him questions about, did you look in this phone and see who had pictures of this? Did you do this? Did you do that? So it was more of a cross of you didn't do all this stuff that probably would have shown you who really had this phone. But I would say, Judge, that even with the circumstantial evidence, this was unusual. This was beyond a normal innocent error or something like that, even if it was a bad error. This was so unusual. It was the fault of the government. They had heard me make this argument. Mr. Rogers had no chance, none, zero chance after that happened, none. And it was completely unfair. All constitutional rights are thrown out of the window, and I would be very upset if he doesn't get another chance at it. What's our standard of review on the denial of your motion for mistrial? I think it's an abuse of discretion. All right, so you say it's an abuse of discretion? I believe so. Although I would, as I thought about it today, because I thought about that question as I was coming in here, is that I have had another case recently where we're talking about, it was in the context of a grand jury situation, but the more basic fundamental tenets of trials and of overseeing the fairness of a trial. And this might be so unusual of a case that it takes us out of your normal analysis and puts us into a different sort of question and review, which is given the egregiousness of what happened here, are we really going to let this trial stand? And what review that may be, I think it's a one in a million kind of situation, but I think that's what we have here. So I ask your honors to do that. And I think the one time it would be fair and appropriate is with what happened here. You ask any person on the street, and you explain what happened to Mr. Rogers, they would say, well, that guy needs a new trial. Everybody says that. Thank you, Judge. We'll have your rebuttal. Thank you. Hello, your honors. Evan Kammaker for the United States. All five of the mistrial factors here point to the reasonability of the district court's decision to strike the testimony and instruct the jurors three times to disregard it. Plain error review does apply because the defendant knew everything, all of the relevant facts for his objection,  at the end of his cross-examination. And yet he waited over an hour for another government witness to testify while Ms. Jones left the courtroom and went across the state. Under this court's decision in the United States against Wiggins, that clearly requires plain error review. Here the delay was even shorter than in that case. But under any standard... You should have asked the judge to stop the trial, excuse the jury, because I have a motion to make outside the presence of the jury. And because of that, it wasn't timely. Yes, your honor. The district court specifically said, all you had to do was say, well, there's something I'd like to chat with you about. It could have been done in a sidebar without having to actually excuse the juror. He wasn't actually given an opportunity to make his motion while the trial was going on. I mean, if he had been given an opportunity and didn't do it, then I could say it wasn't timely. But once he makes the motion at his first opportunity where there's a break in the trial, it's hard for me to say that he sat on his rights. I understand, your honor. He's being courteous to the court. He doesn't want to confuse the jury by what's going on here, why do we have to leave. Okay, either way, I don't see his plain error review. That's fine. I would submit that's basically the facts of Wiggins where the lawyer waited until after a break. But under any standard of review, even under abusive discretion review, we think this is a straightforward case because the five mistrial factors point in favor of simply striking the evidence. Okay, all of them or the way they're balanced? Well, I think actually all of them, your honor, but certainly the way they're imbalanced, right? On the facts of this case, one, two, and four are kind of interlinked. The question of was the evidence, the remarks solicited, was there a reasonable line of inquiry, and did the government act in bad faith? The district court specifically found, after hearing the government's explanation of what they were trying to do, that they were acting reasonably and they were completely surprised by the affirmative response of the witness. As just came up in, actually, Judge Griffin, your own question, in his opening statement, Mr. Rogers had just previously said there's an innocent explanation, or there could be an innocent explanation, as to why Mr. Rogers' DNA was found on Ms. Jones' steering wheel. And he was offering speculation about perhaps there was some reason why Mr. Rogers had driven her car previously or had touched her just before she drove her car. So it was reasonable for the government to establish that Ms. Jones, in fact, had never invited him to drive the car, had never touched him before she drove the car. And that's why they started with the question, do you recognize this defendant? Expecting the answer to be no as a prelude to then quashing this speculative DNA defense. Now, in hindsight, could the attorney have instead said, do you know the defendant as opposed to do you recognize the defendant? Absolutely. But that slight distinction in wording does not cross the line to a due process violation. The district court found that there was no bad faith on the part of the government attorneys. They were expecting a no answer so that they could develop this defense or this response to the defense. And for that reason, those factors all favor the government in this case. The third factor is exceedingly strong, right? As soon, the next morning, as soon as the court held a hearing and frankly determined that the identification was not improperly suggested, but out of an abundance of caution and with the party's agreement, nonetheless struck the testimony, the court immediately told the jury, disregard this identification. Now, that's normally subjected to a presumption of compliance. But in this case, we know the jury was paying attention and complied because an hour later, a juror sent a question back to the judge saying, we want clarification as to the amount of the testimony that you intended to strike. And the court clarified, I only mean to strike Ms. Jones' identification. The rest of it stands. And again, disregard that remark. There was a third curative instruction which was given right before jury deliberations. The standard instruction that says, there may be extraneous things that I told you to disregard during the trial. Remember to disregard them. But that instruction, at defense counsel's insistence, specifically again referred to the identification. So you have three clear and immediate, strong curative instructions given to the jury. The fifth factor that Your Honor asked about is whether or not the identification played just a small part of the evidence against the defendant in this case. And that is clearly true. With respect to the theft of Ms. Jones' Ford Fusion, you have the DNA evidence on the steering wheel. The expert said 13 octillion times more likely than not to be his. And you have, as you said yourself, the cell phone evidence, indicating that Defendant Rogers was communicating directly with the two other original co-defendants, Garner and Harvard, at the time of the carjacking, using the three cell phone towers in the immediate vicinity of the scene. So we have him communicating with his co-defendants at the scene, at the time of the scene, plus the DNA evidence. You also have Pinkerton liability, based on the entire conspiracy here, with all the evidence that supported the other carjackings. Your Honor mentioned specifically Rogers' cousin, Jalessa Collins, who testified both that she personally saw Rogers driving and doing donuts in the distinctive orange and black striped Challenger just after it was carjacked, claiming it was his. And then she narrated a surveillance video as it was played to the jury, in which Rogers arrives in that same Challenger to a gas station, exits the car, goes to another driver, accosts him, and steals the second car. So she serves as an eyewitness, essentially making him complicit in two of the different carjackings. The only issue of credibility, which of course, Your Honors, is left for the jury and not for this court, had to do with the timing of when Jalessa Collins claimed she saw him driving the Challenger. Even if you discredited that testimony, it has nothing to do with her then narrating the surveillance video, as it is shown to the jury, saying, here's the Challenger, here's Eric Rogers getting out, here's him stealing another car, and then all of them driving off. It seems clear that the bulk of the evidence, in fact, the district court used the phrase, the overwhelming amount of evidence of testimony, supports guilt in this case. And the district court judge specifically said, there's no reason why the jury would ever have needed to ignore my remarks to disregard the identification, because the rest of the testimony is, quote, frankly, overwhelming. So I would actually suggest that all five factors favor what the court did here, but certainly the bulk of them did, Your Honor. Okay, at the time that the government attorney asked the question, do you recognize the defendant, had the defense, you said that they indicated they may raise the defense that he entered the car with consent, or what was that about? In the defense opening statement, as the defense was walking through the testimony and the evidence that was, they thought, going to be presented against their client, Mr. Rogers' counsel says, we know there's DNA evidence that links Mr. Rogers to two of the cars and palm prints on one of the cars. And he basically said there could be innocent explanations for why this is possible. Okay, so he didn't say what the explanation was. At that time, he did not. If you wanted to counter a defense that they raise, you could have called her back on the stand to rebut whatever it was. I mean, at this point, identification, I mean, it really isn't an issue, and you're speculating. I mean, that's why I think the line of questioning was not reasonable, because the defense had not been presented yet. I understand, Your Honor. You're still in your case in chief. Two things, Your Honor. The defendant never actually put on a defense in this case. So had the government not examined the witness at that moment in time, they never would have had another opportunity to do so. Remember that this witness was driven all the way across the state, from Mount Pleasant in the west side of the state to Detroit for the trial. She left immediately to go back at the end of her testimony, which is another reason why there is arguably some prejudice here by the fact that there was not a timely objection. The district court specifically said, had you objected earlier, we could have brought her back to the stand and asked her more questions about this. But there wasn't going to be another opportunity. The only other time that DNA was discussed by the defense was when he cross-examined the government's experts that talked about DNA, and he once again raised exactly that speculation, asking questions like, isn't it possible that somebody's DNA could be in a car because they drove it much earlier? Isn't it possible that the DNA could be in a car because they touched somebody and transferred their DNA to their hands who then drove the car? So I understand that the word recognize, a better word choice could have been made, Your Honor. But the line of inquiry seemed reasonable. I will add the government asked the same, engaged in the same line of inquiry later in the trial with the other victim in whose car the DNA was found. So it wasn't just Ms. Jones. They knew, the government knew that every time DNA was found in a car, they had to establish from that driver that there was no reasonable basis for the DNA finding its way there through some innocent means. Anything further? Not an issue, Your Honor. I would rest on the briefs on the other legal issues unless there are further questions. No further questions? All right. Thank you very much, Your Honors. Mr. Amberg, do you have a rebuttal? Yes, Your Honor. And I don't have too much to add, Your Honors. I understand now that the government's position is this was some sort of rational inquiry about whether or not, you know, Mr. Rogers knew Ms. Jones. I don't buy that one bit, not at all. I think what happened was is that the prosecutor, it's like, well, I'll take that back a second. If that's the case, then what are you doing telling this witness who he is? What are you doing? Not kicking that witness out immediately. What are you doing telling her you're going to ask that you're going to ask her about identification but you don't know the answer? It just goes to show you what really happened here. It was in bad faith. And, you know, I know, Judge Griffin, you did ask me that question. I did write some notes down about that before I got up here and I forgot to look at them. And what I said was this. It was bad faith to not immediately remove Ms. Jones from the courtroom. It was bad faith allowing Ms. Jones to see Mr. Rogers in handcuffs. It was bad faith to ask questions to Ms. Jones knowing that she had never ID'd him in the past even though basically every other one of these witnesses that testified had done identifications, and many of those included Mr. Rogers. What else did I write down here? You're saying that the government knew that she was going to identify him. And I think all the indications are no. The government's shocked as well as everybody else. Well, I think there's a happy medium. Do I think that this was some sort of secret plot to get her to do this? No, I don't think that. I don't think that's real. But what I do think is what is the bad faith is that you can't do all of those things and then come in and not expect that witness to do that. If you tell somebody, hey, that's the guy that did it, look at the guy in handcuffs, do all this stuff, but you've never done a single thing, even though you did it with every other witness, to do any kind of identification, and then you ask that question, if you didn't know what was going to happen, you were playing with fire on that one, plain and simple. And I think I put in the case from New Jersey where New Jersey talks about lineups and how people can be mistaken and things like that that happen later in time. If you think about that, when that is happening and the government is telling Ms. Jones who my client is, I would expect that if you asked Ms. Jones, well, who is he? Look at the guy, you're going to get that answer. The question was, do you recognize him, right? It wasn't, is that the defendant, but do you recognize him? Isn't that the specific question? Yeah. All right. And the answer, he's still expected a no answer, even though it's obvious he's the defendant, he's on trial, but do you recognize him? It would be different if none of the stuff happened beforehand. That would be a completely different issue. I would not be here advocating like this for that kind of issue. It is a different scenario when you have done all sorts of things that would make this the most ridiculous and unlawful identification of all time, and then ask that question. It's a different situation because by asking that question, you pretty much know what that answer is going to be. Whether you meant to do that or not, it doesn't matter. It was still bad faith to do all that other stuff. I mean, look at the guy with the glasses over there. Look at him. I mean, that's what happened here. It was so egregious. It was so egregious. I would ask that Your Honors give Mr. Rogers that new trial. This is the one in a million, this one. It truly is. Thank you so much. All right. Thank you for your service to the court. Thank you, Your Honor. I try my best. I win them once in a while.